**David M. Michael, SBN 74310**
**MICHAEL & BURCH, LLP**
**One Sansome Street #3500**
**San Francisco, California 94104**
**Telephone: (415) 946-8996**
**Facsimile:  (877) 538-6220**
**Email: david@michaelburchlaw.com**

**Attorney for Plaintiff**
**LONNIE L. KOCONTES**

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

LONNIE L. KOCONTES,                )
                                   )
                    Plaintiff,     )     **Case No. 8:19-cv-01968-PSG-PLA**
                                   )
          vs.                      )
                                   )     **First Amended Complaint**
ORANGE COUNTY SHERIFF'S            )
DEPARTMENT, GLOBAL TEL LINK,       )     **Demand for Jury Trial**
AND DOES 1-10,                     )
                                   )
                    Defendants,    )
_____/   )

        Plaintiff Lonnie L. Kocontes, by and through counsel and for his First Amended
Complaint alleges as follows:

        Jurisdiction and Venue

        1.       This is a civil rights complaint brought under 42 U.S.C. § 1983 and 28 U.S.C. §§
1331 and 1343 (a). This Court has jurisdiction thereunder and under section 1988. Venue lies
because the actions and omissions of the defendants occurred in this judicial district. 28 U.S.C. §
1931 (b). This Court has jurisdiction over the state law claims asserted by Plaintiff under 28
U.S.C. § 1367.  Diversity jurisdiction also exists over Plaintiff's state law claims under 28 U.S.C.
§ 1332 because Plaintiff is a domiciliary of Florida and Defendant Global Tel Link (GTL) is a
Virginia Corporation.

2.    Plaintiff Lonnie L. Kocontes is, and was at all material times, an inmate awaiting trial in the Orange County Jail. Plaintiff has not been convicted of a crime.

3.    Defendant Orange County Sheriff's Department (OCSD) is responsible for all operational aspects of the Orange County Jail, including housing, classification, and discipline of inmates.

4.    Defendant Global Tel Link (GTL), a foreign corporation, contracts with the OCSD to provide inmate telephone service on a pre-paid basis. GTL rebates to OCSD as much as 65% of the revenue generated through inmate telephone calls. GTL offers its services nationally and is a multi-billion dollar company.

5.    Defendants Does 1-10 are participants in civil rights violations and torts complained of herein. Their true identities are presently unknown to Plaintiff, but he will seek leave to substitute their true identities as soon as they become known to him in discovery

**Claim I**

The following civil rights have been violated: 1st, 6th, 14th and 5th Amendments (procedural due process).

Plaintiff's right to communicate confidentially with his attorneys, David Michael, James Bustamante, Edward Burch, Maha Kasim, and Correen Ferrentino, all of whom either represented Plaintiff in his two pending criminal cases (O.C.S.C. #'s 13ZF0163 and 15CF0995) or were consulted for the purpose of assisting Plaintiff in one or both cases. Plaintiff, who was and remains a pretrial detainee in both cases, alleges a violation of his First and Sixth Amendment rights in the recording of over 165 telephone calls to these attorneys between March 2013 and August 27, 2019. Plaintiff asserts that this intentional recording of his privileged phone calls was done as part of a widespread practice to aid law enforcement by providing such recordings to criminal investigators and disclose defense strategy and factual information relating to pending cases that would otherwise remain unknown to law enforcement.

Plaintiff had a liberty interest in confidential calls to counsel created by Penal Code § 636. *See Carlo v. Chino* (9th Cir 1997) 105, F 3d 493, 497) (procedural due process protects right to call attorney created by state statute. Also, limitations for continuing violations of repeated

acts runs from the most recent violation, not the first. *E.g., Turley v. Rednour* (7th Cir. 2013) 729 F. 3d 645, 651 (cause of action accrues from date of last incidence of that violation; violation is n continuing where it would be unreasonable to require or even permit a prisoner to sue separately over every incident); (*Gutowsky v. County of Placer* (9th Cir. 1997) 108 F. 3d 256, 259 (continuing violation doctrine applies when series of related acts, one or more of which falls within the limitations period).

Moreover, because Plaintiff is a pretrial detainee, interference with effective attorney-client communication is itself prejudicial to his ability to defend the criminal charges against him. *See Benjamin v. Fraser* (2nd Cir. 2001) 264 F. 3d 175, 185 – 186 (Holding that the "actual injury" requirement of *Lewis v. Casey* does not apply to 6th Amendment claims of pretrial detainees). Finally, a prisoner may state a *Monell* claim against a public entity based on a long-standing practice or custom, such as when the public entity fails to implement procedural safeguards to prevent constitutional violations. E.g., *Lapachet v. Cal. Forensic Med. Group, Inc.* (E.D. Cal. 2018) 313 F. Supp. 3d 1183, 1192. Plaintiff has alleged facts sufficient to show that Defendants OCSD and GTL engaged in joint action because OCSD knowingly accepted both financial and investigatory benefits derived from GTL's unconstitutional and tortious recordings and distribution of Plaintiff's attorney telephone calls from jail, such that GTL acted under color of law. See, *Kirtley v. Rainey* (9th Cir. 2003) 326 F. 3d 1088, 1093.

**Supporting Facts – Claim I**

6.     Plaintiff has been continuously incarcerated as a pretrial detainee in the Orange County Jail since March 2013.

7.     Plaintiff is appearing in propria persona in case #15CF0995 pending in Orange County Superior Court and has been representing himself in that case since November 2018.

8.     Prior to representing himself in #15CF0995, Plaintiff was represented by the Associate Public Defender of Orange County from December 2017 – November 2018, and by Correen Ferrentino from 2015 – December 2017.

9.     Plaintiff is also a pretrial detainee in O.C.S.C. #13ZF0163. From 2013 – December 2017, Plaintiff was represented by David Michael, James Bustamante, and Edward

Burch. David Michael and Edward Burch continue to represent Plaintiff in United States District Court case # 2:09-cv-04381 (CD. Cal) and the government's related appeal after summary judgment was granted against the government, 9th Circuit # 13-55194. The federal asset forfeiture resulting in these two federal cases alleges the same facts as O.C.S.C. #13ZF0163, i.e., the unlawful homicide of Micki Kanesaki.

10.     This claim is brought against Defendants OCSD, GTL, and Does 1-3.

11.     OCSD contracts with GTL to provide telephone service to inmates of the Orange County Jail. GTL rebates as much as 65% of the revenue from inmate telephone services.

12.     Doe #1, an employee of OCSD, conspired with Doe #2, an employee of GTL, to record Plaintiff's attorney-client telephone calls for the purpose of providing the recordings to the OCSD investigators handling Plaintiff's criminal cases, which, in fact, occurred.

13.     Defendants OCSD, GTL and Does 1-2 recorded Plaintiff's privileged telephone calls from the jail as part of a widespread practice in which the privileged phone calls of scores of high-profile criminal defendants were recorded and provided to law enforcement for the purpose of aiding criminal prosecutions.

14.     These defendants took such actions despite knowing that they were committing felony violations of Penal Code § 636 and violating Plaintiff's (and other criminal defendants') rights to the effective assistance of counsel.

15.     These defendants recorded privileged phone calls of jail inmates, including Plaintiff, without permission over a period of multiple years going back at least to 2013, unbeknownst to the inmates whose privileged calls were being recorded, including Plaintiff.

16.     From March 2013 through and including August 27, 2019 Defendants OCSD, GTL and Does 1-2 intentionally recorded over 165 of Plaintiff's privileged telephone calls to the above-named attorneys.

17.     Plaintiff did not learn that any of his privileged phone calls were recorded until August 2016, when the district attorney prosecuting case #13ZF0163, filed a motion in that case disclosing that the attorney phone calls had been recorded and seeking judicial permission for the prosecutor herself to listen to them.

18.     In oral representations to the Court, the prosecutor represented that the recording of Plaintiff's privileged calls was an isolated oversight, and that the only reason the issue arose was because Plaintiff's counsel, David Michael, had made a discovery request for any and all recordings of Plaintiff's conversations while in the jail.

19.     Plaintiff, who was unaware of the falsity of the prosecutor's representations regarding the circumstances of the recording of his privileged conversations, relied on such representations by taking no action to pursue a civil claim.

20.     In July 2019, however, Plaintiff learned from reviewing pleadings in *People v Weisz,* O.C.S.C. #18WF0433, which were provided to him by inmate Joshua Waring, that recording of privileged phone conversations was actually part of a widespread practice by OCSD and GTL for the purpose of providing privileged information to law enforcement investigators to aid in the criminal prosecutions of inmates.

21.     When the true extent of the OCSD's and GTL's conspiracy to record and disclose inmates' privileged phone calls began to be exposed in 2018, representatives of GTL falsely claimed that a file of attorney telephone numbers had become "corrupted" and therefore the recordings were accidentally made.

22.     But GTL had used this same false excuse in Clearwater, Florida several months earlier when prosecutors there learned that privileged phone calls were being recorded from their local jail by GTL.

23.     In fact, GTL recorded inmates' privileged calls at the direction of, and in participation with, OCSD's direction, and with full knowledge that such recordings would be provided to law enforcement for the purpose of assisting in the criminal prosecutions of the inmates placing the calls, including Plaintiff.

24.     Over the past several years, OCSD and GTL have recorded and provided to law enforcement investigators participating in the prosecution of the inmates placing the calls, tens of thousands of privileged phone calls, i.e., calls to criminal defense counsel. In each such instance GTL did so at the direction of and with authorization of OCSD.

25.     The recordings of Plaintiff's privileged telephone calls were provided by GTL to Investigator Quinlantan of the OCSD, a member of the prosecution team in both of Plaintiff's pending cases, even though GTL knew that the recordings were privileged and made in felony violation of Penal Code § 636.

26.     Doe #3, an employee of GTL, retrieved some of the recordings of Plaintiff's privileged telephone calls from GTL's computer servers and provided them to Investigator Quilantan.

27.     In each instance in which Plaintiff's privileged phone calls were recorded, GTL staff were legally prohibited by Penal Code § 636 and established constitutional precedent from doing so, yet GTL participated in and assisted OCSD in violating Plaintiff's right to have confidential communications with attorneys, including those representing him in pending criminal cases, by following OCSD's direction to record and then distribute the recordings to law enforcement investigators pursuing pending cases against Plaintiff.

28.     At all times during which GTL and OCSD were recording Plaintiff's privileged phone calls, GTL and OCSD had the telephone numbers of the attorneys and knew that Plaintiff was calling attorneys. These actions have chilled Plaintiff's communications with counsel.

29.     As a result of the recording and disclosure of Plaintiff's privileged conversations, the prosecution team in case #13ZF0995 learned defense strategy, including how Plaintiff intended to impeach key prosecution witnesses Amy Nguyen, Bill Price, and Frank Brentnell, as well as Plaintiff's consulting experts' opinions on such matters as cause of death, motive for prosecution witnesses to fabricate, the incidence of cruise ship crime perpetrated by crew members, and Plaintiff's potential testimony.

**Claim II**

Plaintiff's 1st and 6th Amendment rights have been violated by the OCSD's opening and reading of Plaintiff's mail from attorneys, courts and government officials, all occurring outside Plaintiff's presence. Plaintiff, who is appearing in propria persona in criminal case #15CF0995, now pending in Orange County Superior Court, must rely on timely delivery of court notices and pleadings from the district attorney to be able to comply with judicial deadlines, for example in

filing reply briefs. But in addition to opening Plaintiff's "legal mail" outside his presence, Defendant OCSD also delays delivering mail to Plaintiff from courts and counsel by as much as two weeks. OCSD has created a liberty interest by enacting a written policy that requires legal mail, including mail from courts and government officials, to be opened only in Plaintiff's presence, and therefore such procedure is also required by due process under the 5th and 14th Amendments. *E.g., Wilkinson v. Austin* (2005) 545 U.S. 209, 125 S. Ct. 2384, 2394; *Neal v. Shimoda* (9th Cir. 1997) 131 F. 3d 818, 827; *Kritenbrink v. Crawford* (D. Nev. 2006) 457 F. Supp. 2d 1139, 1147 ("Liberty interests may be granted by state and prison regulations and may thereby invoke due process protections"). As a pro se criminal defendant, Plaintiff is entitled to greater constitutional protections than represented defendants concerning access to the courts, which would necessarily encompass legal mail. *See e.g., U.S. v. Janis* (S.D. Cal. 1992) 820 F. Supp. 512, 515 ("Because Janis is representing himself, he will need more [law] library time than an inmate represented by an attorney"). Finally, in just the past three months, OCSD jail staff have refused and returned legal mail clearly marked as coming from attorneys on at least two occasions of which Plaintiff is aware. The intentional interference with incoming attorney mail states a claim for interference with a criminal defendant's 6th Amendment right to counsel, and the violation of confidentiality itself and the attendant chilling effect is sufficient to establish prejudice. *Nordstrom v. Ryan* (9th Cir. 2014) 762 F. 3d 903, 910 (noting the prejudice of the chilling effect such interference creates and describing the "right to privately confer with counsel is nearly sacrosanct"); *Bieregu v. Reno* (3rd Cir. 1995) 59 F. 3d 1445, 1455 (rejecting interference with attorney-client mail because, "of all communications, attorney mail is the most sacrosanct").

**<u>Supporting Facts – Claim II</u>**

30.     This claim is brought against Defendant OCSD and Does 4-5.

31.     The OCSD has promulgated policies to govern its operation of the jail, which it publishes as the "Courts, Custody Operations Manual. Policy 1600.3 (b) (2) states:

> Legal Mail – There is no limit on the amount of legal mail an
> inmate may send or receive. Inmates may correspond

confidentially with state and federal courts, any member of the
State Bar or holder of public office, the State Board of Corrections,
or the Division Commander. Legal mail may be sealed by the
inmate in the presence of a Deputy and after the mail has been
inspected for contraband. The Deputy will initial the letter across
the seal and include his/her badge number.

32.    Policy 1600.3 (b) (3) states:

Incoming confidential/legal mail may be checked for contraband,
checks, or money orders, provided the mail is opened in the
presence of the inmate.

33.    Investigators handling Plaintiff's criminal cases have asked the jail to provide them with "mail cover," meaning that Plaintiff's outgoing and incoming unprivileged/non-confidential mail is copied and provided to them

34.    Within the last four years, Defendant OCSD authorized and instructed Does #4 and #5, who work in the jail's mail room, to open, copy, and distribute Plaintiff's incoming legal mail, providing copies to the OCSD investigators handling Plaintiff's pending criminal cases.

35.    The opening, copying, and distribution of Plaintiff's incoming legal mail included mail from Plaintiff's criminal defense counsel relating to his pending criminal cases on multiple occasions.

36.    Plaintiff submitted grievances regarding the opening of his legal mail outside his presence, but is unable to provide copies/exact dates because either the grievances were never answered, or OCSD deputies took Plaintiff's copies during searches of Plaintiff's cells. Plaintiff will seek copies of such grievances in discovery.

37.    In the summer of 2016, in response to one of Plaintiff's grievances, an individual who identified himself as a mail room supervisor told Plaintiff in response to a grievance about legal mail being opened outside Plaintiff's presence that because of the high volume of mail received by the jail, nothing would be done to stop the opening of Plaintiff's legal mail outside his presence.

38.    In April 2019, Plaintiff attempted to mail a document to Department C-45 of the Orange County Superior Court for in propria persona filing. He used an indigent "legal mail

only" envelope supplied by the jail as required by 15CCR § 1063 (e). But instead of applying postage, the jail deposited it in the mail without postage. When the envelope was returned about 2 weeks later, Deputy Riley thought it was incoming legal mail, so he opened it in Plaintiff's presence on 4/22/19. This significantly delayed the filing of the document.

39.     On 7/24/19, the Orange County Superior Court mailed Plaintiff a Minute order that the jail held until 8/6/19.

40.     On 7/18/19, Department C-5 of the Orange County Superior Court mailed a minute order to Plaintiff that he never received through the mail and was unaware of until his court-appointed investigator provided it on 8/15/19.

41.     On 8/6/19, Plaintiff received and envelope stamped "Legal Mail" that was from the Orange County Public Defender (Stacy Kelly) addressed to inmate Oliver Britson #3090696.

42.     Also, on 8/6/19, Plaintiff received another envelope from the Orange County Superior Court that was mailed on 7/29/19 (in addition to the one mailed 7/24/19 referenced above in paragraph 34).

43.     On multiple occasions, the jail has delayed delivering oppositions to Plaintiff's motions (in case #15CF0995 in which he represents himself), which has prejudiced his defense by preventing him from filing timely reply briefs. For example, on 10/25/19, the Orange County District Attorney mailed an opposition to Plaintiff's motion for sanctions, which was heard on 8/1/19, The jail did not deliver the opposition until 8/3/19, preventing Plaintiff from replying or even reviewing the opposition before the 8/1/19 hearing.

44.     On August 11, 2019 Plaintiff's current counsel in case #13ZF0163, the Associate Defender of Orange County, mailed documents to Plaintiff. The jail, without explanation, returned the envelope to the sender. Although Plaintiff was supposed to be provided with a mail disposition notice explaining why his mail was rejected, he did not receive one.

45.     On or about 8/21/19, the jail rejected an envelope addressed to Plaintiff from his former defense counsel in case #13Zf0163 that contained documents relating to that case. The envelope was clearly labeled "attorney-client privileged." Again, the jail did not provide Plaintiff with a mail disposition notice regarding the rejection of his legal mail.

46.     In each instance of delay and rejection of Plaintiff's legal mail, Plaintiff was prejudiced in his defense of a pending criminal case in that he was prevented from timely filing a document such as a reply brief, motion, or petition.

**Claim III**

Plaintiff's 5th and 14th Amendment rights have been violated by Defendant OCSD's classification of him as a "sex offender" and placement in administrative segregation without ever affording him a hearing and opportunity to rebut such classification with evidence. OCSD classified Plaintiff as a "protective custody – sex offender (PCS)" purportedly based on an arrest in 2000 in which Plaintiff was accused of consensual sexual contact with a minor, but the charges against him were dismissed after DNA evidence failed to link him to the alleged victim and Plaintiff established irrefutable alibi evidence. Because he was never convicted, Plaintiff was entitled under the Due Process Clause and applicable regulation/policy to a hearing and opportunity to present evidence before being classified and placed in maximum security housing where he is confined to a cell 23 hours per day, and he was entitled to such hearing thereafter each time he requested review of his classification, which he was allowed to do every 30 days.

Plaintiff was initially classified as a minimum custody, general population inmate, making him eligible for the least restrictive, dormitory-style housing, inmate worker status, and participation in inmate programs. But instead, Plaintiff was reclassified as PCS upon transfer from Intake/Release Center (IRC) to Theo Lacy Jail (TLJ) and placed in administrative segregation. As a PCS – labeled inmate, Plaintiff has suffered significant stigma and retaliation from jail staff and inmates alike, including attempts to sabotage his food with razor blades and rocks, being issued disciplinary reports after searches when general population inmates were found in possession of the same "contraband" (alleged excess clothing for which Plaintiff had medical authorization), derogatory comments such as "chomo" (child molester) and placement with and near mentally-ill inmates, who make up a significant proportion of PCS inmates, one of whom, without provocation, attacked Plaintiff, puncturing his eardrum and causing permanent hearing loss. The stigmatizing effect of being labeled as a sex offender has been established as a matter of law. *Kritenbrink v. Crawford* (D. Nev. 2006) 457 F. Supp. 2d 1139, 1146 ("as a matter

of law, Plaintiff need not show stigmatization resulting from this type of classification. The Ninth Circuit has held that labeling someone as a sex offender is inherently stigmatizing") (citing *Neal v. Shimoda* (9th Cir. 1997) 131 F. 3d 818, 829). *Neal* held that "the classification of an inmate as a sex offender is precisely the type of 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' that the Supreme Court held created a protected liberty interest." *Id*. at 829 (citing Sandin v. Conner (1995) 515 U.S. 472, 482, 115 S. Ct. 2293, 2300).

## **Supporting Facts – Claim III**

47.     This claim is brought against Defendant OCSD and Does 6-8.

48.     Upon his arrival at the IRC of the Orange County Jail in March 2013, Plaintiff was classified as a minimum security, general population inmate and issued a white wristband signifying such classification.

49.     In August 2013 Plaintiff was transferred to Theo Lacy Jail, where he was immediately isolated and placed in a holding cell by himself. After about ten hours, three deputies of the Special Handling Unit, Does 6-8, came into the holding cell and informed Plaintiff that he was being reclassified as a protective custody – sex offender (PCS) (The Special Handling Unit coordinated the placement of jailhouse snitches, resulting in the Dekraai snitch scandal that exposed the extensive *Massiah* violations within the jail. *See People v. Dekraai* (2016) 5 Cal. App. 5th 1110, 1141-1145. Plaintiff was eventually placed in a cell with an informant, resulting in case no. 15CF0995.)

50.     The identities of Does 6-8 are unknown to Plaintiff as they wore black T-shirts without names on them.

51.     Does 6-8 claimed that Plaintiff's reclassification as a PCS was based on an arrest in 2000 in which he was accused of sexual contact with a minor.

52.     When Plaintiff protested that the charges against him had been dismissed after DNA testing and he established irrefutable alibi evidence, he was told if he didn't accept reclassification and wear the protective custody blue wristband, he would be administratively

placed in "the hole" (disciplinary isolation), where he would have no access to his legal documents or a telephone.

53.    After putting a blue wristband on Plaintiff, he was placed in a two-person cell, where he was limited to one hour of "day" room every day, which was his only access to shower or use the telephone.

54.    Had Plaintiff remained a general population, "white band" inmate, he would have been placed in a dormitory at Theo Lacy Jail, where he would have access to day room nearly the entire day, and would have been eligible for inmate programs, including the inmate worker program. Inmates in protective custody have no access to programs.

55.    As a PCS inmate, Plaintiff's status was communicated to the general population inmates every time he went to court when he was placed in the same holding cell each time (#16) with "PCS" written on it in large black letters (on the glass door).

56.    When general population inmates passed by holding cell #16, they would sometimes extend their middle fingers towards the inmates in the holding cell and say things like "Fuck you, chomos." Deputies who observed this would typically smile.

57.    When PCS inmates in holding cell #16 would ask deputies for toilet paper, the deputies would either claim to be out (even though a large box of it was against the wall behind them) or say "sure, in a minute" but then never bring any.

58.    Deputies working in the holding cells area (the "Loop") also refuse to respond to the emergency intercom button from the PCS holding cell.

59.    PCS inmates are considered objects of hatred by both jail staff and inmates. Within the general Population inmates, one is expected to attack a PCS inmate if given the opportunity.

60.    Plaintiff, while housed in a sector (cellblock) containing only PCS inmates, has found razor blades and rocks in his food. All food is served by general population inmate workers. In each such instance, Plaintiff reported the contaminant to deputies, but he is unaware of whether it was documented. Such incidents occurred within the past four years.

61.     Defendants (OCSD and Does 6-8) were aware when they placed Plaintiff in a sector with all PCS – labeled inmates that a disproportionate percentage of those inmates are mentally-ill and violent.

62.     In December 2015 Plaintiff was attacked from behind without provocation by a mentally-ill inmate named Jeffrey Smith, who struck Plaintiff in the ear, puncturing his eardrum and causing permanent hearing loss.

63.     Deputies in Plaintiff's sector (J-7 of TLJ) were aware that Smith had hostility towards Plaintiff a just a couple of days before the attack they observed Smith screaming incoherently at Plaintiff and they removed him from the area.

64.     Defendants OCSD and Does 6-8 were deliberately indifferent to the risk of harm to Plaintiff by placing him with and continuing to maintain him with mentally ill, violent inmates in the PCS classification.

65.     Because of his PCS status, Plaintiff has been disciplined for conduct that is excused when committed by general population inmates, For example, in 2017 Plaintiff received a disciplinary report for possessing a pillow without a name on it.

66.     A more recent example occurred on 8/17/19 when, during what Plaintiff was told was a routine cell search, he received a disciplinary report for having extra underwear. (Plaintiff had been transferred to the medical module, where different classifications of inmates are housed in the same sectors.) During this same search, the general population inmate in the cell next to Plaintiff was found in possession of an extra sheet, but he was not disciplined for it.

**Claim IV – Due Process Violations In Discipline**

Plaintiff's procedural and substantive due process rights have been consistently violated by Defendant OCSD in its discipline of Plaintiff for purported rule violations. The procedural violations result from OCSD's de facto policy of denying all inmates the right to call and question witnesses at disciplinary hearings, failing to identify the evidence relied on in the written notices imposing punishment and notifying inmates of finding of guilt, and beginning punishment before an inmate has time to submit and obtain a ruling on the appeal process set forth in OCSD written policy. These de facto policies, which are implemented without regard to

whether any specific security concerns could justify them, violate the minimum due process procedural protections required by *Wolff v. McDonnell* (1974) 418 U.S. 539, 563-567, 94 S. Ct. 2963. The procedural requirements of *Wolff* apply to *any* punishment imposed on a pretrial detainee, regardless of whether "the state has conferred a liberty interest from confinement conditions 'imposing atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Mitchell v. Dupnik* (9th Cir. 1996) 75 F. 3d 517, 523-524 (citing *Sandin v. Conner* (1995) 515 U.S. 472, 115 S. Ct. 2293 and explaining that None of this rationale applies, however, to a pretrial detainee like Shabazz, who had not been convicted or sentenced at the time he was disciplined"); *see also Loret v. Selsky* (W.D.N.Y. 2009) 595 F. Supp. 2d 231, 234 ("Simply invoking security concerns, with no articulation at all of how institutional security could be jeopardized or compromised by turning over the evidence in question, does not meet that minimum constitutional standard"). Plaintiff further alleges a violation of his substantive due process rights in that the disciplinary rules have been applied to him in an arbitrary and capricious manner. Specifically, the jail's disciplinary rules do not define "contraband," which allows jail staff to arbitrarily label an item as "contraband" and issue a disciplinary violation notice to any inmate that staff dislikes. For example, Plaintiff has been disciplined for possession of a pillow, "extra" clothing, passing lunch meat, and having rolled-up newspaper under his door to keep cold air out of his cell. (Plaintiff has rheumatoid arthritis and cold exacerbates the pain in his damaged joints.

**Supporting Facts – Claim IV**

67.    This claim is brought against Defendant OCSD and Does 9 and 10, who are supervisory jail staff who know that the jail's disciplinary system operates unconstitutionally as described herein and are deliberately indifferent to the harm inflicted thereby.

68.    Between September 2015 and September 2019, Plaintiff has been disciplined at least six times for "possessing" or "passing" "contraband."

69.    In the two cases of "passing contraband," the purported "contraband" consisted of food items.

70.    The jail's disciplinary rules do not define "contraband."

71.     In application, the term "contraband" is applied by jail staff to any item that they wish to so label, and is therefore arbitrarily and capriciously applied.

72.     Plaintiff has been disciplined for "contraband" in the form of lunchmeat, extra clothing, including for which he had a medical authorization, a pillow, and for having rolled-up newspaper under his cell door to keep cold air out.

73.     Punishment for each alleged disciplinary violation has been what the jail labels "loss of all privileges," i.e., loss of "day" room, outdoor recreation, commissary, and visits, typically for ten days at a time.

74.     The only time Plaintiff was allowed out of his cell while on "loss of all privileges" was every other night for ten minutes to shower.

75.     When Defendant OCSD conducts disciplinary hearings, the sergeant who acts as the hearing officer never allows the inmate who is accused of the violation to review the incident report written by the jail staff who initiated the disciplinary violation notice, even though that hearing officer considers such incident report as evidence in determining guilt.

76.     Similarly, the hearing officer never allows the inmate accused of a rule violation to call and question witnesses, regardless of whether any security concern would justify such a restriction. Instead, outside the accused inmate's presence, the hearing officer may ask the witness if he wishes to be a witness for the accused, which in the case of other inmates typically intimidates them into declining.

77.     Inmates who are accused of rule violations are also not allowed to question the staff person who initiated the disciplinary notice and wrote the incident report, who are not usually present for the hearing; but even if that staff is present, the accused inmate is not allowed to question him.

78.     When an inmate is notified that he has been found guilty of a rule violation, he is not informed of the evidence relied upon by the hearing officer, if any, nor the reasons for such finding. The form the inmate is given merely states, "After consideration of the evidence, the following finding was made: Facts determined to be found." The form then states the punishment.

79.     In each instance in which Plaintiff was disciplined for a "major" violation (which was all but one), he submitted a written appeal of the discipline. In the majority of the cases he received no written response to the appeal.

80.     Inmates are typically punished before expiration of the 14-day period in which they may appeal, which runs from the date on which they are notified of the punishment. For example, Plaintiff was notified on 8/25/19 that he had been found guilty of possessing contraband (extra underwear), with ten days loss of all privileges beginning on 8/30/19. Plaintiff appealed the next day, but had already served half of the punishment when a lieutenant came to Plaintiff's housing module to inform him that his appeal was granted based on his medical authorization.

**Claim V – Violation Of California's Invasion Of Privacy Act**

81.     Plaintiff incorporates by reference the allegations of paragraphs 1-23 above as though fully set forth here.

82.     This claim is brought against Defendants OCSD, GTL and Does 1-3 for violating California's Invasion of Privacy Act, Penal Code §§ 636 *et seq*. and arises out of the same facts as the constitutional violations alleged in Claim I.

83.     Penal Code § 636 prohibits the recording of a conversation between a person in law enforcement custody and his attorney without permission from all parties to the conversation, and makes such action a felony.

84.     By recording Plaintiff's conversations with his counsel as set forth in Claim I above Defendants OCSD, GTL and Does 1-3 violated Penal Code § 636 and the California's Invasion of Privacy Act.

85.     Penal Code § 637.2 creates a civil cause of action against persons who violate the California's Invasion of Privacy Act, including damages of $5,000.00 per violation.

**Claim VI – Violation Of California's Unfair Business Practices Act**

86.     Plaintiff incorporates by reference the allegations of paragraphs 1-23 above as though fully set forth here.

87.     This claim is brought against Defendants OCSD and GTL for violating California's Unfair Business Practices Act, California Business and Professions Code §§ 17200 *et seq.* and arises from the same facts as the constitutional violations alleged in Claim I.

88.     Defendant GTL rebates as much as 65% of the revenue it obtains from operating the inmate telephone system to OCSD. Thus, OCSD and GTL operate the inmate telephone system as a joint venture in which they share the revenue therefrom.

89.     Plaintiff, through the attorneys that he called on the GTL system, paid or became obligated to pay over $3,000.00. GTL requires call recipients to prepay for calls placed by inmates through opening an account and funding it prior to being able to accept an inmate's call.

90.     Defendants OCSD and GTL failed to disclose to Plaintiff or his attorneys that they were recording their telephone calls or that they were providing such recordings to law enforcement investigating then-pending criminal charges against Plaintiff.

91.     Had Defendants OCSD and GTL disclosed to Plaintiff or his attorneys that they were recording the calls Plaintiff placed to his attorneys, Plaintiff would not have placed the calls and incurred the expense thereof.

92.     The Unfair Business Practices Act provides, in addition to damages, for attorney's fees to the prevailing party in such a claim.

**Claim VII – Common Law Fraudulent Concealment**

93.     Plaintiff incorporates by reference the allegations of paragraphs 1-23 and 83-86 above as though fully set forth here.

94.     Plaintiff brings this claim against Defendants OCSD and GTL.

95.     Defendant OCSD knew, through Investigator Quilantan's monitoring of Plaintiff's telephone calls from jail, that Plaintiff's calls to his attorneys were being recorded in violation of Penal Code § 636.

96.     Despite OCSD's knowledge that Plaintiff's calls to attorneys were being recorded illegally, OCSD did not disclose and concealed from Plaintiff that his calls were being recorded.

97.     Defendant GTL knew that the telephone numbers it was recording that Plaintiff called included his attorneys' numbers.

98.     Defendant GTL also knew that it had not placed the phone numbers of Plaintiff's attorneys on any "do not record" list, and GTL knew that attorneys in California were generally not aware that inmates' telephone calls to attorneys from the Orange County Jail were recorded, nor were they aware of any procedure by which attorneys could have their telephone numbers placed on a "do not record" list.

99.     Defendants OCSD and GTL also knew from prior criminal litigation in California and other states that it was illegal and improper to record inmates' telephone calls to attorneys.

100.    Despite OCSD's and GTL's knowledge as described above, they intentionally failed to disclose and concealed from Plaintiff and the attorneys he called on the GTL system that they were recording their telephone calls and then distributing same to law enforcement investigators involved in Plaintiff's criminal prosecution.

101.    Defendants OCSD and GTL failed to disclose the above for the purpose of inducing Plaintiff to use the GTL system to call attorneys at OCSD's and GTL's financial gain, in which these defendants were successful.

102.    Plaintiff would not have used the GTL system to call attorneys had he known that such calls would be recorded and then provided to law enforcement investigating him.

103.    Defendant OCSD's and GTL's failure to disclose and concealment as described herein has damaged Plaintiff in that he incurred the costs of the calls, his privileged information was disclosed to members of the prosecution team pursuing criminal charges against him, and the chilling effect defendants' actions have had on his ability to communicate with his attorneys.

**Claim VIII – Common Law Negligence**

104.    Plaintiff incorporates by reference the allegations of paragraphs 1-23 above as though fully set forth here.

105.    This claim is brought against Defendants OCSD and GTL.

106.    OCSD and GTL had a duty not to record and distribute to criminal investigators Plaintiff's telephone calls to attorneys.

107.    OCSD and GTL breached that duty as described herein.

108.     OCSD's and GTL's breach of duty was both the actual and proximate cause of damages to Plaintiff, including the cost of the calls, the disclosure of his privileged information to members of the prosecution team pursuing criminal charges against him, and the chilling effect defendants' breach of duty has had on Plaintiff's ability to communicate with his attorneys.

**Request For Relief**

109.     Plaintiff requests a permanent injunction requiring Defendants OCSD and GTL to destroy the original and all copies of recordings between Plaintiff and attorneys.

110.     Plaintiff also requests a permanent injunction requiring Defendant OCSD to: (1) reclassify Plaintiff as a minimum custody, general population inmate; (2) expunge all records of Plaintiff having been classified as a sex offender; (3) maintain a written tracking log of all Plaintiff's incoming "Legal Mail" showing the sender, the date received, and, as evidenced by Plaintiff's signature, the date delivered to him; and (4) expunge all records of Plaintiff's disciplinary violations to date and afford Plaintiff due process in connection with any future disciplinary prosecutions, including the right to call and question witnesses absent a documented security reason justifying the refusal to allow a specific witness, the right to review all evidence against him at the time of the hearing, including any incident report(s), notice of the specific evidence relied upon if found guilty, and suspension of punishment until such time as an appeal is decided, or if no appeal is made, expiration of the time in which an appeal is allowed under applicable OCSD policy.

111.     Plaintiff requests nominal, actual, statutory, and punitive damages.

112.     Plaintiff also requests reasonable attorney's fees as allowed by law.

113.     **Plaintiff Demands Trial by Jury**

Dated: December 2, 2019

By:     *s/David M. Michael*_____
        DAVID M. MICHAEL
        Michael & Burch LLP

        Attorney for Plaintiff
        Lonnie L. Kocontes

First Amended Complaint
Case No. 8:19-cv-01968-PSG-PLA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that, on 2 December 2019, I caused to be electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/David M.Michael*
DAVID M. MICHAEL

Attorney for Claimant
LONNIE KOCONTES

First Amended Complaint
Case No. 8:19-cv-01968-PSG-PLA